KING, Circuit Judge,
dissenting:
Today the majority spurns controlling precedent in upholding the constitutionality of a Virginia statute that establishes religion in the public schools of the Commonwealth. By mandating a “minute of silence” at the start of each schoolday, the Commonwealth has engaged in a thinly veiled attempt to reintroduce state-sanctioned prayer into its schools. See Va. Code Ann. § 22.1-203 (Michie 2000) (the ‘Virginia statute”). Because the Virginia statute is repugnant to the Constitution’s Establishment Clause and erodes the separation between church and state, I must dissent.
The First Amendment, applicable to the states through the Fourteenth, explicitly declares that “Congress shall make no law respecting an establishment of religion.” U.S. Const. amend. I; Cantwell v. Connecticut, 310 U.S. 296, 303, 60 S.Ct. 900, 84 L.Ed. 1213 (1940). By making the Establishment Clause part of the supreme law of the land, the Framers sought to protect our citizenry from the coercive power of majoritarian government by denying it the authority to legislate in the furtherance of any religion. Through the ages, the Supreme Court has recognized the neutral, “hands off’ role that government in our country must play regarding the establishment of religion. As Justice Clark eloquently stated years ago,
The place of religion in our society is an exalted one, achieved through a long tradition of reliance on the home, the church and the inviolable citadel of the individual heart and mind. We have come to recognize through bitter experience that it is not within the power of government to invade that citadel, whether its purpose or effect be to aid or oppose, to advance or retard.
Sch. Dist. of Abington Township v. Schempp, 374 U.S. 203, 226, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963).
Although the majority characterizes it otherwise, the “minute of silence” mandated by the Virginia statute is, like the Trojan Horse, a hollow guise. But the citizens of Virginia have naught to fear from Greek soldiers. Instead, the Commonwealth bears its “gift” as a means of invading Justice Clark’s “inviolable citadel” — the hearts and minds of Virginia school children — in an effort to once more usher state-sponsored religion into public schools.
I subscribe to religious tolerance and, as a Scottish Presbyterian, I have nothing against prayer — either self-initiated or sponsored by and carried out by families and religious organizations. It is elementary, moreover, that under our Constitution and the Supreme Court’s binding interpretations of it, the meticulous separation of church and state is designed not to protect government from religion, but to protect American citizens and their religious practices from government.
*283 I.
The majority cannot uphold the constitutionality of the Virginia statute without directly contravening controlling Supreme Court precedent, most notably Wallace v. Jaffree, 472 U.S. 38, 105 S.Ct. 2479, 86 L.Ed.2d 29 (1985), and Santa Fe Independent School District v. Doe, 530 U.S. 290, 120 S.Ct. 2266, 147 L.Ed.2d 295 (2000).[1] These decisions require us to conclude that the Virginia statute fails to pass constitutional muster under the test set forth in Lemon v. Kurtzman, 403 U.S. 602, 612-13, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971) (holding that, to comport with the Establishment Clause, “[f]irst, the statute must have a secular legislative purpose”).
Under the Lemon test’s first prong, “it is appropriate to ask 'whether government’s actual purpose is to endorse or disapprove of religion.’ ” Wallace, 472 U.S. at 56, 105 S.Ct. 2479 (quoting Lynch v. Donnelly, 465 U.S. 668, 690, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984) (O’Connor, J., concurring)). In making this determination, we may inquire “ “whether an objective observer, acquainted with the text, legislative history, and implementation of the statute, would perceive it as a state endorsement of prayer in public schools.’ ” Santa Fe, 530 U.S. at 308, 120 S.Ct. 2266 (quoting Wallace, 472 U.S. at 76, 105 S.Ct. 2479 (O’Connor, J., concurring in judgment)). Given the circumstances surrounding enactment of the Virginia statute, we are compelled to answer these questions with a resounding “Yes!”.[2]
A.
The historical facts surrounding passage of the Virginia statute are undisputed; it is the interpretation of these facts that lies at the core of this controversy. Thus, we must bear in mind that our inquiry is “ ‘in large part a legal question to be answered on the basis of judicial interpretation of social facts[J ” and that “[ejvery government practice must be judged in its unique cireumstances[.]” Santa Fe, 530 U.S. at 315, 120 S.Ct. 2266 (quoting Lynch, 465 U.S. at 694, 104 S.Ct. 1355 (O’Connor, J., concurring)). In this inquiry, the following points are salient:
• The Virginia statute’s preamble fails to provide any purpose unrelated to religion, but rather speaks only of accommodating religious observances on school property;
*284 • The legislature defeated a proposed amendment that would have deleted “pray” as one of just two specific activities identified by the statute as acceptable uses of the minute of silence;
• In amending an antecedent, permissive statute, the legislature imposed a mandatory observance, affecting some one million Virginia schoolchildren;
• The Virginia statute provides for the Commonwealth’s defense of individual school systems from the inevitable lawsuits challenging the statute’s constitutionality;
• The legislature contemporaneously passed a joint resolution denouncing the Supreme Court’s landmark decision in Engel v. Vitale, 370 U.S. 421, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962) (declaring that state-sponsored prayer in public schools contravenes the Establishment Clause), and requesting Congress to pass a constitutional amendment permitting voluntary prayer in the classroom.
The Commonwealth contends that there are only secular purposes behind the Virginia statute, such as instilling calm in the classroom and accommodating the free exercise of religion. However, the statute’s true aim is clear: to encourage students to pray.
I am struck by the pertinent comments of Senator John Edwards of Roanoke during floor debate of the Virginia statute. Senator Edwards remarked: “I went to seminary. I’m a religious person. I also respect the rights of others.... When we put in a bill that, in effect, requires a moment of prayer, then we are offending the First Amendment and we’re offending those whose beliefs are different than ours.” J.A. 180.[3] Just a few months later, in his Santa Fe opinion, Justice Stevens emphasized that “nothing in the Constitution as interpreted by this Court prohibits any public school student from voluntarily praying at any time before, during, or after the schoolday. But the religious liberty protected by the Constitution is abridged when the State affirmatively sponsors the particular religious practice of prayer.” Santa Fe, 530 U.S. at 313, 120 S.Ct. 2266.
B.
To effectively counter the position espoused by my friend Judge Niemeyer, I need not look beyond the pertinent and binding Supreme Court decisions — including Wallace and Santa Fe — involving transgressions of the Establishment Clause in our public schools. Sixteen years ago in Wallace, the Court determined that the Alabama statute at issue (permitting a minute of silence for “meditation or voluntary prayer” at the start of each schoolday) failed the first prong of the Lemon test because its object was wholly religious. See 472 U.S. at 56, 105 S.Ct. 2479. The Court so concluded because, in relevant part, the measure’s sponsor inserted into the legislative record a statement that the statute was an “effort to return voluntary prayer” to the public schools. See id. at 56-57, 105 S.Ct. 2479. Moreover, there was an existing minute of *285 silence statute in Alabama, without the “prayer” option, that already fully served any secular purpose. See id. at 59, 105 S.Ct. 2479.[4]
The majority seeks to distinguish Wallace on the ground that while the Alabama statute had no secular purpose, the Virginia statute has at least two neutral goals: accommodating the free exercise of religion, and improving student focus and discipline. These secular goals, according to the majority, satisfy the Lemon test’s first prong, because “a statute fails on this account [only] when ‘there is no evidence of a legitimate, secular purpose^]’ ” Ante, at 276 (quoting Koenick v. Felton, 190 F.3d 259, 265 (4th Cir.1999)) (emphasis in original). This conclusion derives from Justice Stevens’s observation in Wallace that “a statute that is motivated in part by a religious purpose may satisfy the first [Lemon] criterion.” 472 U.S. at 56, 105 S.Ct. 2479 (emphasis added). Of course, this ambiguous comment also bolsters the converse argument that a statute is not necessarily saved from invalidation under the Establishment Clause merely because it serves some secular purpose. Compare Lynch, 465 U.S. at 680, 104 S.Ct. 1355 (Burger, C.J.) (recounting that “[t]he Court has invalidated legislation or governmental action on the ground that a secular purpose was lacking, but only when it has concluded there was no question that the statute or activity was motivated wholly by religious considerations”), with id. at 690-91, 104 S.Ct. 1355 (O’Connor, J., concurring) (maintaining that the Lemon test’s first prong “is not satisfied ... by the mere existence of some secular purpose, however dominated by religious purposes”).
Although I harbor serious doubts concerning the soundness of the majority’s viewpoint, I find it unnecessary to engage in this debate, because it is manifest that a purported secular purpose cannot possibly satisfy the Lemon test’s first prong if that purpose is patently insincere. See Santa Fe, 530 U.S. at 308, 120 S.Ct. 2266 (recognizing that, while “some deference” is owed to a legislature’s professed secular purpose for an arguably religious policy, “it is nonetheless the duty of the courts to ‘distinguish a sham secular purpose from a sincere one’”) (quoting Wallace, 472 U.S. at 75, 105 S.Ct. 2479 (O’Connor, J., concurring in judgment)) (alteration in original); see also Stone v. Graham, 449 U.S. 39, 41, 101 S.Ct. 192, 66 L.Ed.2d 199 (1980) (invalidating a Kentucky statute requiring the posting of the Ten Commandments in public school classrooms, despite purported secular educational purposes, because “[t]he pre-eminent purpose for posting the Ten Commandments on schoolroom walls is plainly religious in nature ... and no legislative recitation of a supposed secular purpose can blind us to that fact”); Schempp, 374 U.S. at 224, 83 S.Ct. 1560 (rejecting assertion that daily readings from the King James version of the Bible served secular educational pur *286 pose, because “[s]urely the place of the Bible as an instrument of religion cannot be gainsaid, and the State’s recognition of the pervading religious character of the ceremony is evident from” policies allowing use of an alternative version of the Bible or opting out of the exercise). We are bound by duty to look below the surface; otherwise, a statute could run afoul of the Establishment Clause only in a Wallace-type situation where legislators are blatantly motivated by impermissible religious considerations. The mandate of the Establishment Clause cannot be so easily and disingenuously evaded.
Indeed, in its recent decision in Santa Fe, the Supreme Court had no trouble discrediting the school district’s asserted purposes for its longstanding policy sanctioning student led prayer prior to high school football games. The district advanced several secular justifications for this pre-game “invocation,” including fostering free expression, solemnizing the sporting event, promoting good sportsmanship and student safety, and establishing an appropriate environment for competition. See Santa Fe, 530 U.S. at 309, 120 S.Ct. 2266. But the Court concluded, inter alia, that the district’s approval of just one specific kind of message, the “invocation” (a term that connotes a religion-infused address), was not necessary to further these asserted purposes. See id. at 306-07, 309, 120 S.Ct. 2266. Moreover, the Court reasoned that “the fact that only one student is permitted to give a content-limited message suggests that this policy does little to ‘foste[r] free expression.’ ” Id. at 309, 120 S.Ct. 2266 (alteration in original). The Court’s detailed examination of the policy’s text in light of the school district’s history of sanctioning pregame prayers led to the inevitable conclusion that this policy could not satisfy the Lemon test’s first prong. Writing for the Court, Justice Stevens explained:
The District ... asks us to pretend that we do not recognize what every Santa Fe High School student understands clearl — that this policy is about prayer. The District further asks us to accept what is obviously untrue: that these messages are necessary to “solemnize” a football game and that this single-student, year-long position is essential to the protection of student speech. We refuse to turn a blind eye to the context in which this policy arose, and that context quells any doubt that this policy was implemented with the purpose of endorsing school prayer.
Id. at 315, 120 S.Ct. 2266. Justice Stevens did not permit the First Amendment to be skirted with a nod and a wink, and neither would I.
C.
In urging us to uphold the constitutionality of the Virginia statute, the Commonwealth asks us to accept three asserted secular purposes: (1) “implementing constitutional guarantees of religious liberty within the public schools”; (2) “maintaining good order and discipline, affording an opportunity for introspection, and improving student focus on the educational activities of the day”; and (3) “extending the benefits of a minute of silence to public schools statewide and providing local school divisions with a defense in any lawsuit against the Act.” Appellees’ Br., at 40. I examine each of these purported justifications in turn.
1.
First, the Commonwealth defends its explicit references to religion and prayer in the Virginia statute as means to accommodate the free exercise of religion. The Commonwealth points to the statute’s preamble, which provides:
*287 In order that the right of every pupil to the free exercise of religion be guaranteed within the schools and that the freedom of each individual pupil be subject to the least possible pressure from the Commonwealth either to engage in, or to refrain from, religious observation on school grounds, the school board of each school division shall establish the daily observance of one minute of silence in each classroom of the division.
Va.Code Ann. § 22.1-203. This preamble, however, is a contradiction in terms. That is, if the Commonwealth of Virginia were truly concerned about subjecting students to undue pressure to engage in or refrain from religious observances during the schoolday, why would it impose a minute of silence in such a manner that students must contemplate daily whether to pray or not? And, if the Old Dominion genuinely wishes to protect the rights of “every pupil” to the free exercise of religion, why would the statute only accommodate those students whose belief systems embrace engaging in prayer while sitting and while remaining silent?
Just as the single-student, content-limited invocation in Santa Fe did little to further the asserted goal of fostering free expression, the Virginia statute is exceedingly limited in its ability to facilitate the free exercise of religion. This statute seeks to accommodate only those public school students who engage in religious observances while silent, seated, and still— that is, primarily those who engage in the accepted and traditional Protestant practices. In so doing, it runs afoul of and treads upon the traditional prayer practices of, for example, Catholic, Muslim, and Jewish children.[5] In these circumstances, the religious practices of such children deserve — and, under the Constitution, they are entitled to — protection from the actions of their government.
Moreover, contrary to the Commonwealth’s assertions, the Virginia statute is entirely unnecessary to protect the free exercise of religion in public schools. Indeed, the Supreme Court rejected a similar free exercise argument in support of the statute in Wallace. See 472 U.S. at 57-58 n. 45, 105 S.Ct. 2479. There, the Court dismissed Governor George C. Wallace’s contention that the Alabama minute of silence measure was “best understood as a permissible accommodation of religion[.]” Id. (citation omitted). The Court concluded that this assertion was based on the unsupported “theory that the free exercise of religion of some of the State’s citizens was burdened before the statute was enacted.” Id. That is, Alabama already permitted a minute of silence during which students could choose to silently pray; therefore, the State did not need to enact a statute specifying prayer as a favored option in order to accommodate the free exercise of religion. See id.; cf. Edwards v. Aguillard, 482 U.S. 578, 587, 107 S.Ct. 2573, 96 L.Ed.2d 510 (1987) (discrediting the contention that a Louisiana stat *288 ute requiring schools to teach creationism with evolution advanced academic freedom, because the statute did not confer “teachers a flexibility that they did not already possess[,]” as “no law prohibited Louisiana public school teachers from teaching any scientific theory”).
In this instance, rather than adding a reference to “prayer” to its minute of silence statute, the Virginia legislature refused to remove it. According to the Commonwealth, an explicit reference was necessary “to guarantee religious liberty and prevent discrimination against prayer.” Appellees’ Br., at 44. This contention, however, like the free exercise defense asserted by Governor Wallace, is premised on the theory that the right to engage in silent prayer would somehow be burdened without inclusion of the word “pray” in the Virginia statute. In support of this theory, the Commonwealth advances a list of recent incidents in Virginia showing “a tendency toward discrimination against religious expression in the public schools,” including prohibitions on Bible club meetings and distribution of religious materials on school property. See id. at 10-11. However, not one of these episodes involved interference with silent prayer and, thus, these incidents fail to support the Commonwealth’s theory of inevitable discrimination.
The Commonwealth’s position is supported only by mere speculation that, without express reference to prayer in the Virginia statute, students would not be advised that prayer is an allowable activity during the minute of silence, or they would be admonished that prayer is an impermissible activity during this time. Such conjecture is entirely insufficient to justify the Commonwealth’s purported accommodation of religious freedom; in turn, it cannot establish a sincere secular purpose for the inclusion of “pray” in the Virginia statute.[6] Because the statute is unnecessary to protect the free exercise of religion, and because it accommodates only select religious observances, it simply cannot be justified as a means to ensure the constitutional rights of Virginia schoolchildren. Cf. Walter v. West Virginia Bd. of Educ., 610 F.Supp. 1169, 1176 (S.D.W.Va.1985) (Hallanan, J.) (rejecting a “free exercise” justification for a West Virginia measure of the same ilk, because this rationale was unprecedented and “inherently contradictory”). Those rights are best protected by the First Amendment itself, as promulgated and ratified over two hundred years ago.
2.
The Commonwealth asserts that the Virginia statute also serves the purpose of providing a quiet moment each morning that will allow students to engage in introspection and to focus on the day ahead, thereby fostering discipline and order in the classroom. Strikingly, no such purpose is mentioned in the statute’s preamble (which speaks only of guaranteeing “the right of every pupil to the free exercise of religion”) or elsewhere in the statute’s text. See Va.Code Ann. § 22.1-203. Indeed, the preamble to the Virginia statute stands in stark contrast to the uncodi-fied preamble to a moment of silence measure in Georgia, which was upheld by the Eleventh Circuit. See Bown v. Gwinnett County Sch. Dist., 112 F.3d 1464 (11th Cir.1997). The pre-amble to the Georgia *289 statute explains that it was intended to provide students “a moment of quiet reflection before plunging headlong into the day’s activities[,]” as a benefit to students and society. Id. at 1466 (quoting Moment of Quiet Reflection in Schools Act, Act No. 770, § 1, 1994 Ga. Laws 256, 256). Moreover, unlike the text of the Virginia statute, the text of the Georgia statute makes clear that the “moment of quiet reflection ... is not intended to be and shall not be conducted as a religious service or exercise but shall be considered as an opportunity for a moment of silent reflection on the anticipated activities of the day.” Id. (quoting Ga.Code Ann. § 20-2-1050(b) (Michie 1996)).[7]
In concluding that the Georgia statute furthered a sincere secular purpose, the Eleventh Circuit determined that: the statute’s “preamble sets forth a clearly secular purpose”; that purpose “is repeated expressly in the language of the statute itself’; “the statute indicates that Georgia is not advocating the moment of quiet reflection as a time for religious activity”; and the legislative history of the statute, “although somewhat conflicting, is not inconsistent with the express statutory language articulating a clear secular purpose and disclaiming a religious purpose.” Bown, 112 F.Bd at 1469-71. By contrast, there is absolutely no mention of the Virginia legislature’s second purported secular purpose — e.g., providing students a minute of valuable introspection and instilling calm in the classroom — in its statute. But there are, of course, plenty of references to prayer and religion.
Moreover, on the one hand, the Eleventh Circuit was persuaded of the Georgia statute’s constitutionality because it removed an express reference to “prayer” from its predecessor statute. See id. at 1469 n. 3 (“The deletion of the words ‘prayer or meditation’ and the substitution *290 of the words ‘period of quiet reflection’ provides some support for the idea that the Act’s purpose is secular and is not to establish a moment of prayer.”). On the other hand, the Virginia legislature refused to remove the word “pray” from its statute. Indeed, that unwillingness to delete “pray” from the Virginia statute demonstrates why it is less like the Georgia statute upheld in Bourn by the Eleventh Circuit, and more like the Alabama statute invalidated in Wallace by the Supreme Court. In Wallace, the Court determined that the addition of “or voluntary prayer” to the existing statute providing solely for a period of “meditation” indicated “that the State intended to characterize prayer as a favored practice.” 472 U.S. at 60, 105 S.Ct. 2479. The Court concluded that “[s]uch an endorsement is not consistent with the established principle that the government must pursue a course of complete neutrality toward religion.” Id. Here, too, it is inescapable that the Virginia legislature intended to endorse prayer as a favored practice, in violation of the Establishment Clause.[8]
Though the majority concludes that the Virginia statute “is designed to provide each student at the beginning of each day an opportunity to think, to meditate, to quiet emotions, to clear the mind, to focus on the day, to relax, to doze, or to pray[,]” ante, at 281, only two of these activities— meditating and praying — are expressly endorsed by the Commonwealth. Moreover, while,,the majority is satisfied that, “[b]e-cause the state imposes no substantive requirement during the silence, [the statute] is not religiously coercive[,]” id., I am not comforted by the Virginia statute’s allowance of “choice.” Simply because the Commonwealth does not explicitly require its public school students to pray does not mean that they are not being subtly coerced to do so.
3.
Finally, the Commonwealth insists that the third secular purpose of the Virginia statute was to amend an existing measure: first, to impose the mandatory — rather than permissive-observance of a minute of silence in order to “extend[ ] the benefits ... to public schools statewide”; and, second, to authorize legal representation by the Attorney General in lawsuits challenging the statute. See Appellees’ Br., at 40. These assertions command little consideration. That is, the compulsory nature of the statute plainly renders it even more offensive than the Wallace statute, which at least made the exercise optional. Moreover, the Commonwealth’s provision of legal representation for the defense of local schools is a telling acknowledgment that the statute invites a constitutional challenge.
II.
Although I need not address the additional requirements of the Lemon test, see supra note 2, I am compelled to comment on the position taken by the majority in its discussion regarding the test’s second prong. The majority rebuffs the plaintiffs assertion that, no matter whether the Virginia statute’s purpose is secular, its “inevitable effect ... will be to promote prayer *291 by creating the perception, especially from the viewpoint of young, impressionable school children, that the Commonwealth endorses prayer.” Ante, at 277-78. In doing so, Judge Niemeyer relies on the Supreme Court’s recent decision in Good News Club v. Milford Central School, — U.S. -, 121 S.Ct. 2093, 150 L.Ed.2d 151 (2001), for the proposition that the special impressionability of children is irrelevant in this case to determining whether the Virginia statute encroaches on the Establishment Clause. See ante, at 277.
I must take issue with Judge Niemeyer’s characterization of the decision in Good News Club. Therein, the Court concluded that a school’s refusal to permit after-hours meetings on its property by a Christian children’s club violated the club’s free speech rights, and that this infringement was unnecessary under the Establishment Clause. In so holding, Justice Thomas pointed out that the impressionability of students would not necessarily be relevant to the Establishment Clause calculus where “the school was not actually advancing religion[.]” Id. In seeking to justify its position, the majority seizes upon this language. See ante, at 278 (“Despite language in Supreme Court precedent recognizing the impressionability of elementary school children and the greater threat of religious coercion attendant to religious displays in elementary schools, nothing the Court has said ‘suggests] that, when the school was not actually advancing religion, the impressionability of students would be relevant to the Establishment Clause issue.’ ”) (internal citations omitted). The majority’s analysis begs the question because it assumes, incorrectly, that the Virginia statute does not “advance religion.”[9]
Contrary to the majority, I find ample support in the Supreme Court’s decisions for the conclusion that Virginia’s one million schoolchildren, some as young as kindergartners, are especially deserving of protection from the Commonwealth’s unconstitutional endorsement of prayer. Indeed, in 1987, Justice Brennan explicitly stated that the Court
has been particularly vigilant in monitoring compliance with the Establishment Clause in elementary and secondary schools. Families entrust public schools with the education of their children, but condition their trust on the understanding that the classroom will not purposely be used to advance religious views that may conflict with the private beliefs of the student and his or her family. Students in such institutions are impres *292 sionable and their attendance is involuntary. The State exerts great authority and coercive power through mandatory attendance requirements, and because of the students’ emulation of teachers as role models and the children’s susceptibility to peer pressure. Furthermore, the public school is at once the symbol of our democracy and the most pervasive means for promoting our common destiny. In no activity of the State is it more vital to keep out divisive forces than in its schools.
Edwards, 482 U.S. at 583-84, 107 S.Ct. 2573 (internal citations, quotation marks, and alterations omitted).
III.
In Virginia, impressionable children must now engage in a minute of silence— and are encouraged to silently pray — at the start of every schoolday. This exercise is sponsored by their government and implemented by their teachers. The observance occurs in Virginia public school classrooms each morning, in a place and at a time when the presence of these schoolchildren is required.
Because this trespass on First Amendment rights is one that we should not abide, I respectfully dissent.

. In emphasizing the importance of precedent, the Court has forcefully stated that “unless we wish anarchy to prevail within the federal judicial system, a precedent of this Court must be followed by the lower federal courts no matter how misguided the judges of those courts may think it to be.” Hutto v. Davis, 454 U.S. 370, 375, 102 S.Ct. 703, 70 L.Ed.2d 556 (1982) (per curiam). As Chief Justice Rehnquist observed in Dickerson v. United States, “While stare decisis is not an inexorable command, ... the doctrine carries such persuasive force that we have always required a departure from precedent to be supported by some 'special justification.' ” 530 U.S. 428, 443, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000) (internal citations and quotation marks omitted). There is, in this case, no special justification to depart from precedent. And even if there were, only the Supreme Court has the power to overrule one of its precedents. See Wallace, 472 U.S. at 47 n. 26, 105 S.Ct. 2479 (citation omitted).

. Because I conclude that the Virginia statute violates the Lemon test's first prong, it is unnecessary to address the test's second and third prongs, i.e., that the statute's “principal or primary effect must be one that neither advances nor inhibits religion,” and that it “must not foster an excessive government entanglement with religion.” Lemon, 403 U.S. at 612-13, 91 S.Ct. 2105 (internal citations and quotation marks omitted). As Justice Stevens observed in his opinion for the Court in Wallace, “[N]o consideration of the second or third [Lemon ] criteria is necessary if a statute does not have a clearly secular purpose.” 472 U.S. at 56, 105 S.Ct. 2479.

. Senator Edwards's remarks are offered not as proof that the Virginia statute violates the Establishment Clause, but rather because he recognized from the entirety of the circumstances — as I do, and as any objective observer should — that the real purpose of the statute is Virginia's endorsement of prayer in the Commonwealth's schools. It is not necessarily helpful to rely on the comments of individual legislators to ascertain the purpose behind the statute, because some insisted that their intent was purely neutral, while others advanced impermissible motives.

. While Justice O’Connor observed, in her concurring opinion in Wallace, that an appropriately drawn moment of silence statute could be constitutional, see 472 U.S. at 73-74, 105 S.Ct. 2479 (O’Connor, J., concurring in the judgment), the Virginia statute is materially indistinguishable from the Alabama statute found invalid in Wallace. That is, the Virginia statute is one where "the face of the statute or its legislative history ... clearly establishes] that it seeks to encourage or promote voluntary prayer over other alternatives, rather than merely provide a quiet moment that may be dedicated to prayer by those so inclined.” Id. at 73, 105 S.Ct. 2479. Indeed, Justice Stevens also recognized that “[t]he legislative intent to return prayer to the public schools is, of course, quite different from merely protecting every student's right to engage in voluntary prayer during an appropriate moment of silence during the schoolday.” Wallace, 472 U.S. at 59, 105 S.Ct. 2479.

. For instance, in her affidavit, twelfth-grader Vanessa Brown of Fairfax, a Catholic, states, "I cannot practice my religion in its customs (i.e., standing, kneeling, genuflecting) without violating the law.” J.A. 199. When praying, Brown either stands or kneels, concluding her prayers "by making the sign of the cross." Id. at 198. Similarly, third-grader Amy Cohen of McLean, a child of the Jewish faith, notes that she often prays through song. See id. at 203. Jordan Kupersmith, an eleventh-grader from Potomac Falls, also expresses his concerns regarding the minute of silence, reasoning that ”[n]ot all religions can pray silently while being seated. Some must stand, some must kneel on a prayer rug.” Id. at 248. A common thread linking these students with other plaintiffs who submitted affidavits is a concern over being ridiculed for not bowing their heads in silent prayer and for asserting opposition to the mandate of the Virginia statute.

. Indeed, the majority rejects as "speculative fear” the plaintiff's assertion that impressionable schoolchildren will perceive the Virginia statute as an endorsement of prayer. See ante, at 278. According to Judge Niemeyer, "In the context of a facial challenge, this fear is speculative at best.” Ante, at 278. The plaintiff's contention regarding the impressionability of children is further discussed at Part II, infra.

. The Georgia statute is of particular interest because, according to the Commonwealth, "[t]he court-approved guidelines for implementing the Georgia statute are the model for the guidelines issued in Virginia.” Appellees' Br., at 33. Indeed, a June 13, 2000 memorandum to school officials from Virginia's Superintendent of Public Instruction adopts the Georgia statute’s preamble, practically verbatim, as a statement of the General Assembly of Virginia's intent in passing its statute (though this is not the statement of purpose adopted by the Virginia legislature in the actual text of the statute). The memorandum provides:
The General Assembly recognized that, in today's hectic society, all too few of our citizens are able to experience a moment of quiet reflection before plunging headlong into the day’s activities, and that our young citizens are particularly affected. This legislation reflects the view that our young, and society as a whole, would be well served if students were afforded a moment of quiet reflection at the beginning of each day. Accordingly, the new statute states the following:
In order that the right of every pupil to the free exercise of religion be guaranteed within the schools....
J.A. 251 (quoting Va.Code Ann. § 22.1-203). The memorandum also counsels that a copy of the Virginia statute should be sent home with students at the beginning of each school year, and it admonishes, like the policy in Bown, that teachers and administrators should be cautioned "not to suggest or imply that students should or should not use that time for prayer." Id. at 252. After newspapers reported that the memorandum instructed school officials that they should avoid advising students that prayer was a permissible activity, Virginia’s Attorney General issued a statement clarifying that students and parents were to be informed in writing at the beginning of each school year of the right to pray, and that, "[i]f school officials believe other steps are needed to convey that information[,] ... nothing in the Superintendent’s memorandum prevents that from being done.” Id. at 254. According to the Attorney General's statement, "It is essential that students be fully advised that they have the fundamental right to use the minute of silence for prayer if they so choose.” Id.

. This impermissible religious purpose is evident throughout the Virginia statute's text and legislative history, not just from an isolated reference to prayer. Thus, it is irrelevant to our inquiry whether use of the word "pray” in a minute of silence measure constitutes a per se violation of the Establishment Clause. See ante, at 281-82 ("The statute’s use of the word 'pray,' in listing an unlimited range of mental activities that are authorized during the minute of silence, cannot by itself be a ground for finding the statute unconstitutional.”).

. Moreover, it seems to me that Justice Thomas simply recognized that "whatever significance” the Court has traditionally assigned to the impressionability of younger children in Establishment Clause cases, this factor has never been used to invalidate the type of conduct at issue in Good News Club — "private religious conduct during nonschool hours [that] merely ... takes place on school premises where elementary school children may be present.” 121 S.Ct. at 2104 (emphasis added). Nonetheless, Justice Thomas proceeded to consider the possible misperceptions of schoolchildren with regard to after-hours religious activities on school grounds. See id. at 2106. In the end, he concluded that "these circumstances simply do not support the theory that small children would perceive endorsement here[,]" and that he could not say "the danger that children would misperceive the endorsement of religion is any greater than the danger that they would perceive a hostility toward the religious viewpoint if the Club were excluded from the public forum.” Id. Because of these particular circumstances, Justice Thomas "decline[d] to employ Establishment Clause jurisprudence using a modified heckler's veto, in which a group's religious activity can be proscribed on the basis of what the youngest members of the audience might misperceive.” Id.